IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 29, 2022

## RANDY OSCAR BLAKENEY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 117431          Kyle A. Hixson, Judge**

_____

## No. E2021-00508-CCA-R3-PC

_____

The Petitioner, Randy Oscar Blakeney, pled guilty in the Knox County Criminal Court to first degree murder and especially aggravated robbery and received a sentence of life plus forty years in confinement. Subsequently, he filed a petition requesting DNA analysis of evidence pursuant to the Post-Conviction DNA Analysis Act of 2001. The post-conviction court summarily denied the petition, and the Petitioner appeals. Based upon our review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Randy Oscar Blakeney.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Sean Deitrick and Hector Sanchez, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

On January 12, 1999, the Petitioner pled guilty to first degree murder and especially aggravated robbery, a Class A felony. At the guilty plea hearing, the State advised the trial court that the Petitioner was agreeing to plead guilty to the first and fifth counts of the indictment and that the recommended sentences were life for the murder conviction plus forty years for the especially aggravated robbery conviction as a Range II, multiple

offender, which was outside of the Petitioner's Range I status. The State then advised the trial court that the State "would agree to waive the jury and to stipulate to the proof in this matter." The trial court asked, "Is that the agreement?" Defense counsel responded, "Your Honor, that is--that is the agreement." The trial court asked, "Mr. Blakeney, you've heard the statement by the Attorney General concerning your case. Is that your understanding of the agreement?" The Petitioner responded, "Yes, sir."

The trial court advised the Petitioner of his rights and asked if he was pleading guilty "freely and voluntarily." The trial court also asked if he was guilty, and the Petitioner answered both questions in the affirmative. The trial court found that the Petitioner was pleading guilty freely, voluntarily, and knowingly, and the State gave the following factual basis for the pleas:

> If called to testify, your Honor, those persons listed on the indictment and on the add-a-witness order signed by the Court would testify that Mrs. Theresa Wilson lived at 4301 Ivy Street in Knoxville, Tennessee, on April 15th, 1994. That she had adult children also, and on that evening, a daughter returned home from work and found Mrs. Wilson dead in the living room floor. She ran from the house and summoned help, and ultimately the police were called.
>
> When the police arrived at the scene, someone had covered Mrs. Wilson's body with a blanket, and they did not disturb the blanket until the medical examiner arrived.
>
> They began their investigation, and the investigation revealed that there had been a struggle that had occurred on both floors of this home. There were blood samples of blood droppings on both sets of floors. The--there was a phone that was inoperable that had been taken off the hook.
>
> When the medical examiner arrived, he removed the blanket and found protruding from Ms. Wilson's back was a knife. He determined that she was dead at that point. There was evidence that she had been stabbed numerous times and beaten. There was a cord from an iron wrapped around her neck at the scene. She was also nude.
>
> The police investigation continued. Criminalistics came out and collected evidence, which included, but was not limited to, a handprint on a wall in blood. That handprint was preserved. It was tested. It was ultimately revealed that the handprint was that of Randy Blakeney. There was also

evidence, when Mr. Blakeney was arrested, that he had numerous cuts on his hands.

The sample was sent on to the TBI. The blood in the handprint was tested, and it was found to be Randy Blakeney's blood.

Also collected at the scene was a newspaper on which there were two bloody shoe prints. Upon his arrest, his shoes were confiscated, and the newspaper and the shoes were sent to the TBI. And there would be proof that the two shoe prints on the piece of paper were made by one of the shoes of the defendant to the exclusion of all others.

It would be further proof from Stella Ewing that on the evening of April 15th, the defendant came to her apartment--she was acquainted with him--and he was bragging about what he had done, including talking about stabbing Mrs. Wilson in the back to make sure that she was dead. At this point, that information was not public and would not have been known to anyone, except the person who had done it.

He also gave her some pieces of jewelry that he claimed came from Mrs. Wilson.

Upon discovering that Mr. Blakeney was not, in fact, lying, the police had contacted Ms. Ewing. They had talked to her about Mr. Blakeney, and she turned over the jewelry to him and also described for the police what Mr. Blakeney had done and said at her apartment on the night of April the 15th.

The police also discovered from other persons there at the apartment that the defendant had thrown some items onto a roof of an adjacent apartment building in Townview Terrace, which is where Ms. Ewing lived, and they recovered those items and they are clothes that belonged to Randy Blakeney.

Other blood samples taken from the house were tested, and there would be proof that a droplet of blood under a door handle in the house, which the police believed to be the point of exit from the house, belongs to the defendant, Randy Blakeney.

The medical examiner's report, your Honor, reveals that the defendant--or the victim had been strangled, suffered blunt trauma to the head and the face, and had multiple lacerations to her face, head, and torso.

There were defensive wounds on both of her arms and her right hand, and there were twelve stab wounds and neck trauma that were inflicted postmortem.

There were several knives confiscated from the scene, your Honor, and one of--even one of which was broken. They were sent to the TBI and all of them revealed the presence of blood.

It would be further proof that all these events occurred in Knox County, Tennessee.

After the State gave the factual basis for the pleas, the Petitioner asked to address the victim's family, and the trial court allowed him to do so. The Petitioner stated that he did not agree with "some things" said by the State in that he "wasn't bragging" to Ms. Ewing about killing the victim. He told the victim's family that he was sorry, that he "wish[ed] it never happened," and that "I took something from y'all that--I mean, I just put myself in y'all's shoes, you know, somebody--if my mother was gone. Just a lot of pain. . . . I hope that God will give us forgiveness in y'all for me playing my role in this situation." Based on the Petitioner's guilty pleas and the "stipulated testimony," the trial court found him guilty and sentenced him to life plus forty years with the forty-year sentence to be served at thirty-five percent release eligibility. The remaining counts of the indictment were dismissed.

On April 14, 2020, the Petitioner filed a petition for DNA analysis of evidence pursuant to the Post-Conviction DNA Analysis Act of 2001. In the petition, he requested testing on fourteen items pursuant to Tennessee Code Annotated section 40-30-305, including the blanket covering the victim's body, the blood on the floors, the knife protruding from her back, the bloody handprint on the wall, and the blood on the door handle. The Petitioner alleged in the petition that a reasonable probability existed that DNA analysis of the evidence "will produce DNA results which would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." The post-conviction court appointed counsel, and post-conviction counsel filed an amended petition in which the Petitioner also requested DNA testing of the victim's clothing and her rape kit. The State responded, arguing that the post-conviction court should summarily dismiss the petition because the convictions were the result of guilty pleas to stipulated facts and because the petition did not state a factual basis for the testing. In the alternative, the State argued that there was no reasonable probability that DNA testing would yield a different outcome.

The post-conviction court held a brief hearing to determine whether it should summarily deny the petition. During the hearing, post-conviction counsel asserted that,

"notwithstanding the recitations from the plea colloquy of the submission hearing," the Petitioner was entitled to testing under the mandatory provision of the Act, Tennessee Code Annotated section 40-30-304. Post-conviction counsel argued that while our supreme court said in State v. Powers, 343 S.W.3d 36 (Tenn. 2011), that a recitation of facts at a guilty plea hearing may be helpful in determining what evidence would have been presented at trial, our supreme court also said that courts should not use a recitation of facts to determine the merits of any claim. Post-conviction counsel further asserted that if DNA testing showed that the Petitioner's DNA was not present at the crime scene, then the post-conviction court would be "compelled" to conclude that the Petitioner would not have been prosecuted or convicted. The State argued that according to Powers, courts must consider evidence presented against a petitioner at trial in determining whether the petitioner should be afforded DNA testing and, therefore, that courts may consider stipulations of fact at guilty plea hearings in making those determinations. The State also argued that given the stipulated facts in this case and the Petitioner's admission of guilt, the post-conviction court should summarily deny the petition.

At the conclusion of the hearing, the post-conviction court agreed with the State and held that it could consider the "stipulated facts" from the Petitioner's guilty plea hearing. The court noted that according to those facts, a bloody handprint matched the Petitioner and that the Petitioner had wounds on his hands. The court also noted that testing had been conducted on the blood in the handprint and the blood on the door handle and that the testing showed the blood belonged to the Petitioner. The post-conviction court questioned whether that testing involved DNA analysis but said the stipulated facts "at least demonstrate some level of additional serology testing in addition to the fingerprint or hand print testing." The post-conviction court found that regardless of the type of testing already conducted, "a number of facts in this case point to Mr. Blakeney's guilt." The post-conviction court described the Petitioner's confession to Ms. Ewing as "very damning" and noted that he gave the victim's jewelry to Ms. Ewing and that witnesses saw someone throw the Petitioner's clothes from the area of Ms. Ewing's apartment building. The post-conviction court stated that the evidence against the Petitioner was "overwhelming."

Furthermore, the post-conviction court noted that the facts indicated that at least one of the victim's adult children lived with her. Therefore, the post-conviction court concluded that even if DNA testing showed the Petitioner's DNA was not at the crime scene, those test results would not necessarily be exculpatory. Accordingly, the post-conviction court concluded that the Petitioner had not met the first prong of either Tennessee Code Annotated section 40-30-304 or Tennessee Code Annotated section 40-30-305 and summarily denied the petition.

## II. Analysis

- 5 -

The Petitioner claims that the post-conviction court erred by relying on "certain stipulations from the guilty plea submission hearing" as a basis for denying his petition and that the post-conviction court erred by denying the petition. The State argues that the post-conviction court could consider the stipulated facts from the guilty plea hearing and that the trial court properly denied the petition for DNA analysis. We agree with the State.

The Post-Conviction DNA Analysis Act of 2001 provides that

> a person convicted of and sentenced for the commission of first degree murder, second degree murder, aggravated rape, rape, aggravated sexual battery or rape of a child, the attempted commission of any of these offenses, any lesser included offense of these offenses, or, at the direction of the trial judge, any other offense, may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

Tenn. Code Ann. § 40-30-303. A post-conviction court must order DNA analysis when a petitioner has met each of the following four requirements:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304. In addition, the post-conviction court may order DNA analysis if "[a] reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction,"

- 6 -

and the Petitioner satisfies conditions two through four above. Tenn. Code Ann. § 40-35-305.

In conducting its analysis of a petitioner's claim, a post-conviction court must presume that the DNA analysis would produce "'favorable'" results to the petitioner. Powers, 343 S.W.3d at 55 & n.28; see Tenn. Code Ann. § 40-30-305(1). "The absence of any one of the four statutory conditions results in the dismissal of the petition." Sedley Alley v. State, No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at *2 (Tenn. Crim. App. at Jackson, May 26, 2004). On appeal, this court will not reverse the post-conviction court's judgment unless it is not supported by substantial evidence. Id. We note that "[t]his court has been reluctant to overturn a post-conviction court's decision denying DNA analysis when petitioner entered a voluntary guilty plea in the trial court." Thomas Edward Kotewa v. State, No. E2011-02527-CCA-R3-PC, 2012 WL 5309563, at *5 (Tenn. Crim. App. at Knoxville, Oct. 26, 2012) (citing as examples Devon M. Crawford v. State, No. W2010-01676-CCA-R3-PC, 2011 WL 2448925, at *4 (Tenn. Crim. App. at Jackson, June 20, 2011), and Harold James Greenleaf, Jr. v. State, No. M2009-01975-CCA-R3-CD, 2010 WL 2244099, at *5 (Tenn. Crim. App. at Nashville, June 4, 2010)).

The Petitioner insists that while our supreme court stated in Powers that a recitation of facts may be "helpful" in determining whether to order DNA analysis, our supreme court also warned that such recitation of facts should not be used to determine "the merits of any claim." See Powers, 343 S.W.3d at 56. However, our review of Powers reveals that the "recitation of the facts" the supreme court was referring to was the recitation of facts contained in appellate opinions, not the factual basis for the plea presented at guilty plea hearings. Id. at 55.

This court has described the facts of an offense as "paramount" to consideration of an issue raised pursuant to the DNA Analysis Act. Harold James Greenleaf, Jr., No. M2009-01975-CCA-R3-CD, 2010 WL 2244099, at *3. Therefore, in determining whether to grant a petition for DNA analysis, "the post-conviction court must consider all the available evidence, including the evidence presented at trial and any stipulations of fact made by either party." Jack Jay Shuttle v. State, No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at *4 (Tenn. Crim. App. at Knoxville, Feb. 3, 2004). In State v. Shaun Lamont Hereford, No. E2002-01222-CCA-R3-PC, 2002 WL 31512370, at *1 (Tenn. Crim. App. at Knoxville, Nov. 13, 2002), this court upheld the post-conviction court's summary dismissal of a petition for DNA analysis when "[t]he lower court declined to direct any discovery or DNA analysis on the grounds that many of the petitioner's convictions were the result of guilty pleas which were presented to the court upon agreed factual bases and in which the defendant admitted guilt." Similarly, in Mark A. Mitchell v. State, No. M2002-01500-CCA-R3-PC, 2003 WL 1868649, at *4 (Tenn. Crim. App. at Nashville,

Apr. 11, 2003), this court affirmed the post-conviction court's denial of a petition for DNA analysis when the petitioner's convictions "were based upon guilty pleas and stipulated facts." Quoting Mark A. Mitchell, our supreme court stated in Powers that it is proper for post-conviction courts to "'consider . . . any stipulations of fact by the petitioner or his counsel and the state.'" Powers, 343 S.W.3d at 55 (quoting Mark A. Mitchell, No. M2002-01500-CCA-R3-PC, 2003 WL 1868649, at *4).

Turning to the instant case, the State gave an extensive factual basis for the Petitioner's guilty pleas. The Petitioner heard the State's factual account of the crimes and said that he did not agree with "some things." Specifically, he only took issue with the fact that he bragged to Ms. Ewing about killing the victim. He then addressed the victim's family members, apologized to them, and asked their forgiveness for his "role" in her death. At the conclusion of the plea hearing, the trial court accepted the Petitioner's pleas and found that he was pleading guilty knowingly, intelligently, and voluntarily. Thus, we conclude that the post-conviction court properly considered the factual basis for the Petitioner's guilty pleas in determining whether to deny the petition for DNA analysis.

Next, the Petitioner claims that the post-conviction court erred by denying the petition because if the DNA test results were to show that his DNA was not present at the crime scene, it is reasonable to conclude that he would not have been prosecuted or would have been able to plead guilty to a lesser crime for a "lower" sentence. We disagree. The Petitioner's bloody handprint and shoeprints were in the victim's home. The victim, who had been stabbed numerous times, had defensive wounds on her arms and right hand; the Petitioner had cuts on his hands; and some type of testing on the bloody handprint and blood on the door handle matched the Petitioner. The Petitioner told Ms. Ewing that he stabbed the victim in the back to make sure she was dead, and he gave Ms. Ewing jewelry that he claimed belonged to the victim. Accordingly, we agree with the post-conviction court that the Petitioner failed to satisfy the first prong of either the mandatory or discretionary provision of the DNA Analysis Act and affirm the post-conviction court's summary denial of the petition.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the post-conviction court's denial of the petition requesting DNA analysis of evidence.

_____
NORMA MCGEE OGLE, JUDGE